The next case is number 09-1267 Chrysler Corporation v. United States, Mr. Goggins. Thank you, Your Honor. May it please the court. My name is Alan Goggins. I represent the plaintiff appellant, Chrysler Corporation, with the law firm of Barnes, Richardson, and Coburn. The reason we're here today, one simple reason. Chrysler paid HMT on exports prior to 1990 as recorded in the government's official records, and Customs Service has refused to refund those HMT payments. That's because you didn't have proof which the regulation requires. The proof is in the government's own records. They say they're not good. Well, the government's records pre-1990 are official government records, and there's a presumption of correctness that applies to official government records, and in this case there was no evidence. General, doesn't a presumption of correctness applies when a private party is challenging the government records? Here the government says right off the bat, we don't have complete records. Well, the same situation occurred in this case. They're abutting the presumption themselves. The same situation occurred in this court's decision in VWP. In VWP, this court said, when you're dealing with official government records, they are presumed to be correct, and it's up to the party challenging those records to produce evidence to show that those specific records are incorrect. You're asking only for what's in the records which they were able to produce, is that right? That's exactly correct, Your Honor, and as the court is certainly aware, the reason why the HMT is here today is the HMT was declared unconstitutional in USU, as Judge Bryson is well aware, and in the aftermath of that case, under the procedures employed by a company called Swisher, which Judge Newman, you're very familiar with that case. In that case, this court held that Swisher was entitled, using the procedures they used. We're all presumptively familiar with all of our laws. Yes. In the case of the export taxes, we're very familiar. They were entitled to a refund of all of the HMT they paid on exports in accordance with the government's own records. Chrysler followed the same exact procedure. Chrysler has not received a refund of all of their HMT paid on exports, as indicated in the government's own records. The court below went wrong in a couple of places. Primarily, they went wrong is that they looked at this HMT regulation, which was created in the aftermath of the Swisher decision. They looked at that regulation, and they said it deserved Chevron deference. That decision is wrong. By the way, the government's brief on page 7 and 8 admits that the HMT refund export regulation is a new regulation, a new procedure. It's not something that existed since 1987. There has been a regulation dealing with records since, what, 1991, right? So the regulation that we're looking at now was a modification of that regulation, as I understand it. Actually, 1989, I pulled some of the old CFRs and looked at them. 1989, there's no HMT refund regulation at all. But 91 is the date. 1995, I pulled another one. There is a refund regulation, but no mention of export refunds, none whatsoever. The first time we have any mention of export refund regulations is 2002, in the aftermath of the Swisher decision. Well, it's not too surprising that the export term was highlighted after U.S.S.U. But there was a refund regulation in place since 91. Is that right? Am I getting the date confused? There was a general refund recommendation basically for errors in payment, not for errors because the statute's unconstitutional. That's a significant intervening event. It's a subset of all errors. Well, the number of errors is more than errors. That's a significant intervening event. Why? Black letter law, when a statute is declared unconstitutional, such as the HMT on exports, that statute is gone. It's null. It's void. It doesn't exist anymore. The HMT statute, as applied to exports, doesn't exist anymore. Yet the trial court wants to give regulations promulgated to somehow interpret the HMT on exports statute deference under Chevron. First step under Chevron analysis, what do you have to have? You have to have a statute. The statute's unconstitutional. It's gone. It doesn't exist anymore. How do you give deference to a regulation interpreting an unconstitutional statute? And that's what the trial court did. I mean, it's kind of like, okay, we're going to fix a pothole in the street when the street doesn't exist. Well, the HMT involves more than just exports. Yes. And those are not at issue before the statute. And so what we've got here is we've got a statute that provides general regulation-making authority to promote the administration of the statute. One, it seems to me not crazy to say that one aspect of the administration of the statute is to make refunds when it is determined that the parties seeking refunds are legally entitled to them.  Therefore, this regulation seems to fall within the authority of that statute. But that's all fine, but the part of the statute that exists pertains suit not. I have to tell you that that part of your argument just struck me as being quite brittle, let's say, for lack of a better term. There's a statute which says that here's HMT. You can promulgate regulations to administer HMT. Part of HMT is declared to be unconstitutional, the consequence of which is you've got to give some money back. Why isn't it okay to say that the agency can come up with regulations for deciding how to give the money back? Well, we have to distinguish between the source of the agency's authority to make those regulations. If there's a statute, then it is legislative authority, statutory. Here, there's no longer statutory authority with regard to export HMT, and indeed, the Seventh Circuit line of cases, the Atchison case that we cited in our brief, says if the source of authority for the regulation is non-legislative, then the proper standard of review for the courts to apply is de novo review. That Atchison case, Seventh Circuit line of authority, was cited in this circuit as controlling precedent in the Merck v. Kessler case that we cited in our brief. So that's the law of this circuit. If there's no authority for promulgating a regulation, where's the authority for the refund? There is authority, but it's non-legislative. And that's a distinction we have to make here, because when it's a non-legislative authority, and indeed, the authority is implementation of this court's decision in Swisher. If it's a non-legislative authority, then it's de novo review, not Chevron deference. Chevron deference applies to a unique subset of regulations that don't exist in this case. Well, really, this isn't Chevron deference, is it? I mean, Chevron deference typically is referenced to regulations in which the agency construes a statutory term. This is more like the deference that the Supreme Court talked about in Mourning Against Family Publications, right? No, the trial court referred to it as Chevron deference. That's right. And I'm suggesting to you that that was probably a slight error in characterization. It seems to me the government is probably right in saying, as it does in its brief, that this is really a Mourning Against Family Publications type deference, which is the category of cases in which Congress gives the agency broad authority to promulgate regulations necessary and appropriate to administer a particular statute, not where the agency is construing a term. As in this case, if the agency were construing the term exports through regulation, then Chevron would come into play. But this is really a different kettle of fish, isn't it? No, this is simply, as in Atkinson and all those cases that we cited, the charter cases. Do you understand what I'm saying about the difference between the two categories? Are you familiar with the Mourning case? Yes, but the regulation here is the implementation of a court decision. You have to think, why is this regulation in place? The regulation is in place to implement the Swisher decision. And when you have a regulation implementing a court decision, de novo review, no deference. Finally, if you get rid of the de novo review, if you get rid of the Chevron deference and you're back to de novo review, then you're left with, okay, what kind of standards, what kind of analysis should the court have applied on a level playing field like that? Well, we have the official government records which say Chrysler paid this amount, $782,000, in export HMT prior to 1990. And we have, what evidence do we have to contradict that? No evidence. No evidence that contradicts the records at issue in this case. None. If you take the teaching of VWP. Are you saying the government has the records and has produced them but simply says they're not reliable? They have electronic records from pre-1990 that were produced in court or before the court. Those records indicate HMT was paid on exports by Chrysler to the tune of $782,000. Now, what's interesting, if you do the math, that period, pre-July 1st, 1990, covers 12 quarters of payments. $782,000 divided by 12, Chrysler paid on average, according to those records, about $65,000 a quarter in HMT on exports. If you look at the subsequent period, the rest of 1990, if you add up those payments that were refunded and accepted by the government, you look at those payments, they paid on average $70,000 in export per quarter on HMT. So there's nothing mysterious about these records. They're consistent with the subsequent history that the government accepts with regard to Chrysler's payments. Very consistent. It's not like Chrysler's making a big claim out of thin air. No, they're making a claim based on actual official government records. And there is nothing in the record to dispute those records. I will save the rest of my time for rebuttal. Yes, we'll hear from you, thank you, Mr. Goggins. Ms. Hogan. Good afternoon, Your Honors. May it please the Court. There's no dispute that Chrysler did not comply with the regulatory requirement that has been in place since 1991 to produce documentation supporting a refund request. But isn't it strange for the government to say, we might have made a mistake, therefore our records, the authenticity of which is not challenged, don't count? Your Honor, the customs absolutely questions the correctness or the reliability of the electronic database, and that is precisely the reason in 2001-2002 why it said we can't relax the requirements that's always been in place. But that's not a question to you. It's their records. Errors have been discovered. But therefore, the entire batch of government record-keeping in these important areas are just being jumped? Well, we're talking something to the tune of $143 million worth of transactions which were improperly categorized as exports across all payers, and something like $25 million worth that were improperly categorized as non-export. And agencies are not required to tailor regulations to particular people. They have to make decisions about how, when they're administering a program, The agency says, we weren't very good at record-keeping, therefore nothing counts. What customs said was, we've determined that this is not reliable. We cannot, in good faith, make refunds out of the public disk. That's what I said. We weren't very good at record-keeping, so our records don't count. Yes, I think as an agency charged with administering this program, the agency is in the best position to know what documentation it can rely on to ensure that the correct amounts are refunded to the correct parties, and only for the correct reasons. Let me ask you, if you would, can you describe for us a bit, because the brief didn't go into this, but I'm curious as to how exactly these records were generated, this electronic database. Walk me through the process. When checks came in to customs for payment of HMT, they were sent to a bank that was charged with collecting the money. They would be sent first to the bank? Yes. Customs wouldn't actually see the check. It would be a check which is to a customs account sent directly to the bank? It would be sent directly to the bank. The information, the check number, the amount, all that stuff, would be placed into a computer database. By the bank? By the bank. That would be transmitted nightly to customs. Customs would also receive the paper documentation in a bundle the next day or the next week. There were many errors made. Who made these errors? Was it the bank or was it customs? It was the bank. It was the payors by sending it to the wrong lockbox, by not identifying whether the payment was for exports or for foreign trade zone admissions or for other quarterly payors. There were errors made by freight forwarders who said these are payments I'm making for five exporters, but I'm not identifying which five. What I'm trying to get at is were these records, we've all been referring to them as customs records, but they were records, I take it, which were generated in large measure, if not entirely, by private entities and then sent to customs? Is that right? The electronic database was predicated on materials prepared by the private entities? They were prepared by... The bank was serving as a fiscal agent for customs. Okay. And so then it would go into customs... It would become part of customs records. I don't think we're disputing that it became customs records because customs maintained it. And as this progressed and as the history of the harbor maintenance tax came through, customs did begin to start verifying with the paper and the electronic. And that's how customs discovered the errors was when this refund procedure started. They began to do that. Now, what was the reason for the date distinction? The point... I forget the date. July 1st, 1990. Yeah. The reason given for saying that after 1990 you would accept electronic materials... No. After 1990, after July 1st, 1990, customs would take it upon itself to use the paper documentation already in its possession to verify the payments. Oh, I see. That's because customs actually had that paper documentation. They weren't relying on the electronic solely. No. Correct. Prior to July 1st, 1990, customs no longer possessed those documents. They had been destroyed in the ordinary course. And so for that... And given the unreliability of the database, customs said we can't rely solely on these electronic records. We need you to continue to turn in the same documentation that you've always been required to turn in in order to receive a refund payment. So although the regulation changed somewhat in 2001, 2002, the substance of the requirement that Chrysler's contesting here has been in place since 1991. And it's worth noting that since 1987, since the inception of the very first customs regulations, claimants or payors have been required to maintain those records for at least five years. So certainly by 1991, that's in 2424G, Chrysler was on notice that if it wanted to request a refund for any reason, whether it was a clerical reason or constitutional reason or any other reason, they would be required to use those paper documentation. And that's precisely the regulation that this court relied upon in Swisher when this court said there is an administrative avenue to receive refunds beyond the two-year statute of limitations, and that's by complying with customs regulations. I find Chrysler's argument that the regulations have no further force to be somewhat puzzling, because if that is indeed the case, that customs doesn't possess the authority to administer these refunds and to make decisions about whether refunds are warranted, then there's no protestable decision. The result has to be that Chrysler's complaint is dismissed before the Court of International Trade because there's no longer a basis for exercising 1581A jurisdiction. So that can't be the result. That would undo Swisher. I don't think that that is what... What do you think is the right way to assess the first of customs' argument that its regulation is reasonable based on its assertion that the records in the electronic database are not reliable? How does one go about assessing whether that is a reasonable conclusion for customs to reach? Is there evidence to which one could look? Was there an administrative record at the time of the rulemaking, or does one simply say, well, that's what customs says and we accept it? I think the court begins with the presumption that the customs makes rules in good faith, and if customs says in its rulemaking we have serious concerns about using solely our electronic records, that the court takes customs at its word. Now, the court may say, well, that doesn't matter, that's not good enough. But I think we have to say that we take customs at its word, that the reason that it's doing it is not some nefarious plan to refuse refunds to exporters, but because there's a serious balance that customs needs to have between refunding export HMT and also protecting the public fisc and ensuring that constitutionally collected HMT is not erroneously refunded from the Treasury. So I think the court looks at those reasons and says, yes, that's reasonably related to the statute. It ensures that only unconstitutionally collected HMT is refunded in the amount sought and by the correct party. There isn't really a way for a party to look behind customs' assertion that these records aren't reliable. Well, before the trial court we did present an affidavit from the director of the National Finance Center that is in the record, I believe, at page 326, where we do give the court specific numbers as to the size of the errors that were determined. We had $143 million worth that were improperly counted. 143 one way and 25 the other way. Right. So in fact, if we were to have only relied upon customs records, theoretically, there would have been payors who were entitled to export HMT refunds that wouldn't have got it because it was improperly categorized. Now, to touch on the question that I asked your opposing counsel with respect to the right framework for looking at this, it's not really a Chevron case. We're not looking at Chevron step one, Chevron step two, so much as we're looking at the category of cases you allude to, the mourning case. There are a few cases from this court as well in which the agency has been given statutory authority to promulgate administrative type regulations and there, I guess, arbitrary and capricious standard applies, right? What the Supreme Court said in mourning was so long as the regulation is reasonably related to the purpose of the statute, it must be accorded the force of law and that is arguably stronger than a Chevron deference. Were any errors identified in any of the Chrysler payments that are here at issue? Well, we have no way of knowing, Your Honor, because we don't have the original documentation that the regulation required Chrysler to provide, so we have no way of knowing precisely why. So we presume that they're erroneous, is that right? Well, the regulation says you need to provide documentation because we can't rely solely on these records and without those documentations, we can't give a refund and that's nothing different than what Customs has said since 1991. What it said in 2001 and 2002 with the rulemaking is we're sorry, but we can't provide this other avenue. Customs did say we recognize that there are exporters who are going to have problems complying with this regulation and for that reason, we're going to permit you to submit other types of documentation such as canceled checks and things like that. And I gather that at least some of these payments were made during the period when the Court ordered Customs to preserve its records? In 1998, the Court of International Trade ordered Customs to preserve all records and I don't think there's... What year was that, I'm sorry? 1998, that was following... 1998, okay. Yes, that was following the Supreme Court's decision in USU. I don't think there's any dispute that all documents were preserved from that point onwards. But the documents that were at issue here were well beyond that and certainly four years before any constitutional challenge was ever made in the Court of International Trade. But the electronic records were preserved. The issue isn't whether they were preserved, is it? But whether they can be given any credence. Well, they were never given any credence before USU. Because when the USU... What do you mean they were never given any credence before? Before the statute was declared unconstitutional or when it didn't matter? Before USU in 1998, if a claimant requested a refund from Customs for any reason, it had to provide the documentation and their request would have been denied for failure... Had to establish the reason for the claim. Right, right. But you're saying that at that time, there was no reliance on electronic record database that had to be in paper? There was never a sole reliance on Customs electronic database. I'm not sure that I understand. If someone says, I paid such and such a tax and I'm entitled to a refund, Customs doesn't look and see whether they have a record that such and such a tax was paid? Well, I'm not saying that Customs never looked at the electronic database, but it was going to require the original documentation. And it may compare that with the electronic database and that's something that Customs did do during the USU refund process was to reconcile the paper documentation, the original documentation, and what had been recorded in the database. But I don't believe that there was ever an opportunity or a place where Customs said, we're only going to rely on the database and not require the original paper documentation or some other form of documentation which could clearly establish that... You told us they didn't keep the original paper documentation. That's what we have here, electronic records. Prior to 1990. So how could they have relied on it? Because the claimant would have provided that documentation as part of its refund request, just as what was required by Swisher, by the Swisher claimant. Okay, any more questions for Ms. Hogan? Okay, thank you, Ms. Hogan. Actually, I do have one question. Let me just make sure that I understand. The argument that's made at the end of the brief about the NARA procedures, do I understand your position to be that that argument was not made before the CIT? No, Chrysler did make an argument about the NARA guidelines. What Chrysler never sought was an adverse inference against Customs based upon... Okay, I understand, right. Okay, thank you, Ms. Hogan. Mr. Goggins? Thank you, Your Honor. Judge Newman, you raised an excellent point. I think your analysis was something along the lines of we're throwing out the baby with the bathwater by not relying on these pre-1990 electronic records. We heard a lot of general statistics reported today. We haven't heard a single scrap of evidence that ties it to the Chrysler HMT records at issue in this case, or any Chrysler records for that matter, any Chrysler HMT records. We haven't heard a single scrap of evidence that a single payment from Chrysler was misrecorded. None, no evidence. In accordance with the VWP standard, when you have official government records that are presumed correct, the party challenging those records, the government has to come up with evidence. The burden is on the government to come up with evidence to prove those records wrong. Again, not a single scrap of evidence that the Chrysler payments were recorded incorrectly. Let's go back to the paper records. You raised an excellent point, Judge Bryson. Something that should be known. The Customs Service was on actual notice before the HMT was enacted that the export provisions were questionable on constitutional grounds as a violation of the export clause. The General Counsel for the Customs Service was grilled by Congress on the constitutionality of the export HMT. The Customs Service had actual notice that this was a questionable statute and a questionable tax. At that time, under the narrow procedures, they should have maintained the records. They didn't. Let's fast forward a couple of years. 1993, 1994, litigation is commencing regarding the HMT on exports. And regarding the HMT in general. At that point, under the narrow procedures, Customs should have maintained all their records. They didn't. Not until 1998, when the court orders them to stop destroying records, did they stop destroying records. This whole mess is all the government's fault because they kept destroying records they were under an obligation, under the narrow, to preserve. Of course, I suppose Chrysler was aware of everything that was happening as well and could have held on to the records. No, Chrysler was not aware that the government was destroying records. No. It was aware of the status of the litigation. Chrysler was aware of the status of the litigation by the Swisher decision. The Swisher decision didn't come out until 2000. If you remember the Swisher decision, the trial court ruled against Swisher. At the trial court level. The appellate court ruled in 2000 and reversed that. So, as of 2000, yes, Chrysler then has noticed that there is a possibility of getting refunds all the way back. But not before 2000. In any event, this isn't a blame game. It's a question of regulation and whether it's valid or not. Yes, it's a question of, in regulation, implementing a court decision, what standard of review do we apply? Do we apply de novo review? And, with regard to these records, does the VWP precedent, controlling precedent in this circuit, does that case mean anything? Does it apply? I think it's right on point. Pointing the finger and saying it's their fault isn't really... No, I'm not saying it's their fault. I'm saying these records were destroyed when they should have been preserved. That's something that should color your decision. That's something to take into consideration. And the VWP case, I think, is right on point  And the trial court, we cited it to the trial court, quoted it at length. The trial court completely ignored it. And I think that's where the trial court went wrong. They ignored binding precedent of this circuit. And, because of that, they have to be reversed. And the trial court should be ordered to refund the HMT price to be paid on exports as indicated in the government's own official records. And that's my time. Thank you. Any more questions? Thank you, Mr. Gallagher. This is Hogan. Case is taken into submission. All rise. The honor of the court is adjourned until tomorrow morning at 10 o'clock a.m.